37 C.C.P.A. (Patents)

## FLOSDORF et al. v. SIEDENTOPF.
### Patent Appeals No. 5713.

United States Court of Customs and Patent Appeals.

June 30, 1950.

Adams, Forward & McLean, New York City (Clarence M. Fisher, Washington, D. C., R. T. McLean, and C. Von Boetticher, Jr., New York City, of counsel), for appellants.

Parry & Miller, Washington, D. C. (Edmund H. Parry, Jr., Washington, D. C., of counsel), for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON and WORLEY, Judges.

WORLEY, Judge.

This is an appeal in an interference proceeding from a decision of the Board of Interference Examiners of the United States Patent Office awarding priority of invention of the subject matter defined in ten counts to appellee.

The invention relates to the desiccation, dehydration, and preservation of biological substances.

The interference involves the application of appellants, serial No. 635,941, filed December 19, 1945, as a division of a parent

application, serial No. 317,958, filed February 8, 1940, which matured into patent No. 2,414,940, dated January 28, 1947, and a patent of appellee, No. 2,380,339, which issued July 10, 1945, on an application filed July 10, 1941.

The ten counts in issue were copied by appellants from the patent of appellee to provoke this interference.

Counts 1, 7, and 10 are illustrative and read as follows:

"1. A method of preserving a dried biological substance desiccated from the frozen state which is under high vacuum in a container in which it is to be stored for future use, including the steps of replacing the high vacuum by filling the evacuated container with an atmosphere of inert gas uncontaminated by moisture or free oxygen while maintaining the dried biologically active substance in the container immune from moisture and air, and sealing the container with said substance and inert gas atmosphere therein."

"7. As a new article of manufacture, a container adapted for storing biologically active substances for future use and having sealed therein under an internal pressure not less than approximately atmospheric pressure a quantity of dried biologically active substance derivative of high vacuum desiccation from the frozen state in an inert gas uncontaminated by free oxygen or moisture."

"10. Apparatus for treating a frozen biological substance in a container in which it is to be sealed and stored comprising desiccating means including a source of high vacuum and a chemical drying agent cooperative to desiccate the biological substance in the container from its frozen state, means establishing communication between the container and both the source of high vacuum and the chemical drying agent during drying, a source of inert gas uncontaminated by moisture or free oxygen, and means establishing communication between the container and said gas source after drying of the biological substance is completed to break the high vacuum in the container and fill the container with said inert gas preparatory to sealing of the container."

Within the interlocutory period appellee moved to dissolve the interference on the ground that appellants had no right to make any of the counts. The Primary Examiner denied the motion. Appellee again urged this contention before the Board of Interference Examiners.

There can be no doubt, as was found by the Board of Interference Examiners, that the counts require preservation in an inert gas which is uncontaminated by free oxygen or moisture. Apparently the question as to the disclosure of moisture content is not in issue. The contention of appellee that appellants failed to disclose the preservation of biological substances in an inert gas was properly dismissed by the examiner and the board.

Counsel for appellee presented extensive testimony and exhibits for the purpose of showing actual reduction to practice of the invention defined by all the counts during a period from July to September 1939, which was prior to the effective date of the application of appellants, namely, February 8, 1940. The board rejected this evidence on the grounds that there was insufficient corroboration that appellee used a moisture-free gas; that there was no substantial proof with respect to the laboratory experiments carried out by appellee because the testimony of appellee's witness was too general and vague; and that since the product of appellee's tests (distemper virus) was of known utility, it was not necessary to reestablish its usefulness as such.

Appellants, in an attempt to establish prior reduction to practice of the invention, relied not only on the filing date of their parent application but also on the filing date of an application dated July 18, 1938, which issued as patent No. 2,388,134, dated October 30, 1945, to Flosdorf, Stokes, and Westin, the latter since deceased. Appellants testified that the third joint inventor had no part in the conception of the use of an inert gas as described and claimed in said patent. No disclaimer as to Westin was presented by anyone on his behalf or by the assignee of record, and the board in its decision properly stated: "Since the leading case of In re Roberts, 49 App.D.C.

250, 263 F. 646, 1920 C.D. 158, a disclaimer by the misjoined party has been a uniform condition for relying on an earlier joint case. A further condition requires a showing that the original joinder was made by mistake * * *. No such showing has been made here." The board held, therefore, that appellants are not entitled to the date of the application of the early three-party patent.

As pointed out by the board, the process of appellants has much in common with that of appellee in that they both disclose the preservation of biological substances, and the vacuum present in both processes is relieved by "gas such as nitrogen or argon."

In pointing out the difficulties encountered in preserving under vacuum, the solution of such difficulties by appellee appears in the specification of his patent as follows:

"Initial efforts to overcome this difficulty by storing the product in an atmosphere of inert gas met with failure, and until the development of the present process, which involves the removal of all traces of oxygen and moisture from the inert gas, it was not possible to store biological substances such as complement, viruses and immune sera for long periods of time without degeneration of the product. It appears that oxygen has a degenerating effect on practically all biological substances of this type, although the degeneration is more noticeable and rapid with some of these substances than with others. Commercial nitrogen having an oxygen content of only one-half of one percent was found to be entirely unsatisfactory, even though all moisture was removed. Likewise, the presence of small traces of moisture has a degenerating effect on biological substances and this possibly results from some chemical reaction, the nature of which is not fully understood at the present time.

"It has now been found that substantially no degeneration takes place if the substance is sealed in the presence of an inert gas from which *all oxygen* as well as *all moisture* has been removed.

"Accordingly the present invention provides a method and apparatus for removal of oxygen and moisture from an inert gas and the introduction of this gas into the evacuated containers to break the vacuum before they are finally sealed. (Italics ours.)"

The vital issue before us is whether appellants disclose or teach that the inert gases of their parent application is free of oxygen, as required by the counts. With respect to that issue, the Primary Examiner and the Board of Interference Examiners disagreed.

In denying appellee's motion to dissolve the interference as to the ten counts in issue, the examiner held that serums (recited in appellants' application) fall within the category of biological substances, as defined by appellee, and that nitrogen and argon are inert gases; that in reciting nitrogen or argon as the gases used for storing biological substances, appellants meant nitrogen or argon *per se* and *"not nitrogen plus oxygen"* (Italics quoted); that nitrogen free of any oxygen has been available since 1912, as disclosed in the patent to Blagburn, No. 1,036,788; and that the words "air, or other gas such as nitrogen or argon" in appellants' application teaches that if the materials to be preserved call for air (dry and sterilized) as a satisfactory medium for admission into the container, the word "air" should be considered an alternative and not an equivalent to the words "nitrogen or argon," which were intended to be inert and uncontaminated by oxygen, as disclosed by Blagburn, supra.

The board observed that as a practical matter the ordinary nitrogen of commerce contains some oxygen. This was brought out in the testimony for appellee. The examiner did not hold to the contrary. His reasoning, as we understand it, is that the nitrogen and argon, as recited in the application of appellants, was intended to mean nitrogen or argon free of oxygen. While it appears that one company, Air Reduction, produced nitrogen practically free of oxygen, such gas was for special purposes. It further appears that the same company, in 1939 and thereafter, sold argon guaranteed to contain less than .008% by volume of

oxygen. It must be remembered, however, that the specification of appellants does not recite the necessity for the use of pure gas and, therefore, we cannot agree that pure gas was indicated in their specification. The kind of inert gases (oxygen-free), as is defined in the counts and as may be observed in the quoted portion of the patent, is the distinctive and critical feature of the invention.

Appellants' application, in our opinion, does not distinctly provide for oxygen-free gas and we find in it no implied teaching with respect thereto. Therefore, it is immaterial, as was held by the board, that "nitrogen free of any oxygen content" was available in the patent literature since 1912 or that oxygen-free gas had been made and sold by Air Reduction, since appellants have shown no appreciation or teaching that such gas should be used in their process.

It is clear to us, from a careful examination, that the parent application of appellants fails to support the counts in issue and, therefore, we are in agreement with the Board of Interference Examiners that since appellee's filing date was prior to the filing date of the involved divisional application, he was properly awarded priority of invention of the subject matter of the counts in issue. Accordingly, the decision of the Board of Interference Examiners is affirmed.

Affirmed.